**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ROBERT J. SNYDER,**
        **Plaintiff,**

**v.**                                    **CIVIL ACTION NO. 2:05CV48**

**JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,**
        **Defendant**.

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Robert J. Snyder ("Plaintiff") filed his application for DIB on April 27, 2000, alleging

disability as of March 11, 1995, due to post-traumatic stress disorder ("PTSD"), tinnitus, sleep

apnea, fatigue, and sensitivity to cold due to metal plates in his jaw (R. 40, 53). His Date Last

Insured ("DLI") is September 30, 1995 (R. 43). He must therefore establish he was disabled on or

before that date. See 42 U.S.C. §423(a), (c); 20 C.F.R. §404.101. Plaintiff's application was

denied initially and on reconsideration. He requested a hearing, which Administrative Law Judge

("ALJ") Barry Anderson held on March 6, 2001 (R. 265). Plaintiff, who was represented by counsel,

appeared and testified. The ALJ rendered a decision on March 11, 2001, finding that Plaintiff did

not have a severe impairment prior to the expiration of his insured status on September 30, 1995 (R.

13-14). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5). Plaintiff filed a civil action in this Court seeking judicial review of the Commissioner's final decision. The undersigned United States Magistrate Judge recommended the case be remanded for further proceedings to address the retrospective opinion of Louis Tinnin, M.D. (R. 219-230). By Order dated April 19, 2004, the Honorable Robert E. Maxwell, United States District Judge adopted the recommendation to remand the case.

On remand, the case was assigned to ALJ Karl Alexander. He held a second administrative hearing on September 8, 2004. Plaintiff, represented by counsel, testified as did his wife and vocational expert Larry Bell ("VE"). In a decision dated October 1, 2004, the second ALJ also concluded that Plaintiff did not demonstrate a severe impairment prior to September 30, 1995, his date last insured. Plaintiff requested review of the Appeal Council (R. 183). The Appeals Council denied review on April 29, 2005, making the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts[1]

Plaintiff was born on June 12, 1945, and was 50 years old at the time his insured status expired in 1995 (R. 57). He has an eleventh grade education, and past relevant work as a packing line technician, a job he held for 22 years before being laid off in December 1989 (R. 170). Plaintiff then owned his own business until 1995, but reportedly did not make any money (R. 171). He apparently sold the business shortly before suffering the injuries that are at issue in this Opinion.

---

[1] Neither party filed any objections to the undersigned's Report and Recommendation entered in the previous case which remanded Plaintiff's claim to the Commissioner. See Civil Action No. 2:02CV28. The Statement of Facts in that case has therefore been accepted by the parties and is repeated almost verbatim here.

Because the relevant time period in this matter is from Plaintiff's alleged onset date of March 1995 through his date last insured of September 30, 1995, the undersigned will discuss the evidence relevant to that time frame.

On March 11, 1995, Plaintiff was reportedly the victim of a criminal assault (R. 171). X-rays showed fractures of the jaw (R. 108).

On April 15, 1995, Plaintiff was seen at the hospital with complaints of fluid in his ears (R. 109). This appears to be the last medical record before Plaintiff's insured status expired on September 30, 1995.

On February 19, 1996, Plaintiff was seen at the Belington Clinic for complaints of cough, sore throat, and congestion for two days (R. 107).

On January 14, 1997, Plaintiff was seen at the clinic for complaints of recurrent headaches (R. 106). It was noted that he had suffered head trauma a year and a half earlier with surgery at West Virginia University hospital. A CT scan of the head was negative.

Two weeks later, Plaintiff followed up at the clinic regarding his headaches (R. 101). He said he was much, much better, and his headaches were improved. Plaintiff's wife still believed the headaches were related to Plaintiff's head trauma a year and a half earlier. A second CT scan of the head was again negative (R. 100).

On November 30, 1998, Plaintiff presented to the clinic complaining that he had passed out for one to three minutes when he got up from bed to feed the cat in the middle of the night (R. 93). A Holter monitor test was unremarkable (R. 89). Plaintiff was diagnosed with questionable depression and was prescribed Paxil.

On December 3, 1998, Plaintiff complained that the Paxil gave him headaches (R. 88). He

3

was switched to Zoloft. Two weeks later, it was determined that Plaintiff also could not tolerate the Zoloft. He refused to try any additional anti-depressants.

On February 2, 1999, Plaintiff complained of cough, sore throat and chest congestion (R. 87).

That same date, Plaintiff saw Louis W. Tinnin, MD, at the Trauma Recovery Institute for psychiatric evaluation (R. 137). Dr. Tinnin described Plaintiff as a 53 year old retired man. His wife had e-mailed Dr. Tinnin regarding treatment for symptoms that arose from the March 1995 assault. Plaintiff told Dr. Tinnin he was unable to make it through the day without distressing recollections of the trauma. He had nightmares nightly, felt loss of control due to the memories, and was returning to his usual activities slowly, at about 70% as much as before the trauma.

In addition to the 1995 trauma, Plaintiff stated he had lost his job of 22 years in 1989, and had not been able to find suitable work since then (R. 137). He had started his own business, but it failed. He also recently lost two close family members.

Plaintiff described his symptoms as feeling shaky inside, being somewhat afraid in open spaces or in the streets, and being excessively worried about everything. His feelings were easily hurt and he felt blue. He often felt so restless he could not sit still, and had spells of terror or panic.

Upon examination, Plaintiff had a presentation of restrained friendliness and constant anxiety (R. 138). He was alert and oriented, and had adequate communication skills. Motor behavior was undisturbed, as was gait, activity level, general expressiveness, and facial expression. He described intrusive, avoidant, and arousal symptoms. His cognitive functions were intact and he had a good fund of knowledge and average intelligence.

Dr. Tinnin diagnosed PTSD; Major Depression; Metal plates in his jaw; and history of trauma, March 1995.

4

On February 11, 1999, nine days later, Plaintiff's reluctance to go to Dr. Tinnin's office had diminished and he seemed less tense.

On February 16, 1999, Plaintiff reported feeling more relaxed and free of headaches (except for one that occurred at his last session) (R. 136). His wife said they were talking together more.

On March 5, 1999, Dr. Tinnin wrote a letter to the West Virginia Court of Claims, opining that Plaintiff was suffering from PTSD and major depression as a direct result of the 1995 assault.

On March 16, 1999, Dr. Tinnin noted that Plaintiff was currently free of intrusive, avoidant, and arousal symptoms, but remained concerned about not working and unhappy about the unavailability of the kind of job that fit his experience (R. 133). "However he is not as obsessed with this." Dr. Tinnin believed there was no indication for further trauma procedures. He thought Plaintiff would benefit from attending the Men's Group, but Plaintiff deferred.

Two weeks later Plaintiff remained asymptomatic and cheerful with no intrusive symptoms (R. 133). He was still considering the Men's Group, but was not able to make it at the time.

In September 1999, Plaintiff had "No PTSD symptoms but considerable nostalgia for the old job. He was "enjoying good health and [] living a productive life."

On October 18, 1999, Plaintiff saw James E. Bland, M.D., an Ear Nose and Throat specialist for complaints of chronic tinnitus, which Plaintiff reported caused sleep disturbance, anxiety, and problems with hearing (R. 79-80). He said the tinnitus began after his assault. Dr. Bland opined that Plaintiff suffered from moderate high frequency sensorineural loss that was noise-induced. Although he indicated there was no effective surgical or medical treatment for the ringing, he recommended antidepressants or nighttime tranquilizers. Dr. Bland noted that Plaintiff was not anxious to try this, but indicated it was a well-recognized treatment for symptomatic tinnitus.

5

In December 1999, Plaintiff was in good spirits, and expected to "continue to be busy." He enjoyed the holidays and was "very active."

In March 2000, Plaintiff was in good spirits and reported no problems.

On April 6, 2000, Plaintiff reported his mood had been "getting low, then relieved when away from home" (R. 130). He was interested in trying the Paxil.

Plaintiff applied for Disability on April 21, 2000, alleging he was unable to be around the noise of machinery; that the sounds created by his tinnitus interfered with his sleep; that PTSD caused psychological disturbances in his daily life and flashbacks; and that he was unable to be exposed to cold (R. 54). He stated he had stopped working on March 11, 1995, due to severe injuries that prevented him from being able to work.

In May 2000, Plaintiff reported that one of the men who assaulted him was released from prison, which "stirred up his anxiety and his grief about the losses he suffered with the trauma" (R. 130). He was having "some return of intrusive symptoms in the form of distressing recollections of the event and nightmares." He was tearful and felt cheated and angry. He had not taken his Paxil until the past week, but assured his psychiatrist he "would take it now."

Plaintiff reportedly had side effects from the Paxil including headaches and sedation, but these seemed to lessen with an adjustment of the dosage, and he reported some benefit, sleeping more restfully, feeling more at ease, and being less aware of his tinnitus (R. 129).

On June 30, 2000, Plaintiff reported the Paxil benefit continued (R. 146). He had excessive sweating and undue fatigue, but improved sleep and mood. He was feeling more anger about his assault and more sorrow about his loss.

On July 19, 2000, State agency reviewing psychologist Frank D. Roman, Ed.D., completed

a Psychiatric Review Technique ("PRT"), opining there was insufficient medical evidence of any mental impairment prior to Plaintiff's date last insured (R. 110).

On July 20, 2000, State agency reviewing physician Fulvio Franyutti, M.D., likewise indicated there was insufficient medical evidence of any mental impairment prior to Plaintiff's date last insured (R. 119).

On July 27, 2000, Plaintiff reported feeling improved on the Paxil, with good sleep, sense of well-being, and feeling "safe" (R. 145). He was having increased postural hypotension, so his doctor reduced the dosage of Paxil.

On August 9, 2000, the State agency denied Plaintiff's claim at the initial level (R. 22).

On August 24, 2000, Plaintiff told his psychiatrist he was in pain due to a metal pin in his jaw, which was stimulating reenactment of his suffering five years earlier (R. 145).

On August 31, 2000, Plaintiff filed his request for reconsideration, stating his health was unstable due to PTSD that interfered with his daily functions and disturbed his rest, and due to constant pain (R. 29).

On September 21, 2000, Plaintiff's psychiatrist noted Plaintiff's condition was worsening and he was quite depressed with despairing mood, irritable affect, anhedonia, anorexia and weight loss (R. 144).

On October 3, two weeks later, Plaintiff was "much improved and beaming" (R. 144). His sleep was good, his energy was good, and he was taking pleasure in little things.

On October 10, 2000, the State agency denied Plaintiff's claim at the reconsideration level (R. 23).

On October 30, 2000, Dr. Tinnin noted Plaintiff had "slipped back with increased intrusive

symptoms, especially nightmares and anguish with memories during the day" (R. 144). That same day Dr. Tinnin wrote a letter to Plaintiff's counsel, stating that Plaintiff was under his care for PTSD and major depression caused by the assault in March 1995 (R. 127). His diagnoses and condition were direct results of the injuries he sustained in the assault. Dr. Tinnin wrote that Plaintiff had been "fearful and loath to consult a psychiatrist until his wife arranged the appointment and coerced him to come in." Dr. Tinnin opined that, despite the delayed treatment, Plaintiff's symptoms had immediately followed the trauma and were not delayed in onset. He also opined that Plaintiff suffered from marked social impairment with "extreme incapacitating distress when exposed to events that symbolize or resemble an aspect of the traumatic event" and feelings of detachment and estrangement from others. He also opined Plaintiff had a marked impairment in concentration with "frequent interruption in his train of thought by intrusive images," and marked impairment in adaptation with phobic avoidance of solitary function, and opined Plaintiff was often totally unable to function outside the home (R. 128). Dr. Tinnin finally opined that it was his medical opinion to a high degree of medical certainty that Plaintiff was "severely impaired and totally disabled and has been so since March 11, 1995."

In late October 2000, Plaintiff filed his Request for Hearing, stating that he was "unable to work secondary to severe impairment of post-traumatic stress disorder" (R. 76). He stated he continued to have significant problems with anxiety, intrusive recollections, nightmares, startle problems, difficulty being in open spaces, depression, lethargy, memory deficits, panic spells, staring spells, and anhedonia, "all related to a March 1995 severe and traumatic criminal assault."

On January 22, 2001, Dr. Tinnin found Plaintiff continued to have intrusive symptoms 50% of the time and remained moderately avoidant (R. 140). His depression was improved but continued

to "hold him down." He opined Plaintiff had no impairment of activities of daily living; moderate impairment of social functioning; moderate impairment of concentration; and moderate impairment of adaptation.

At the first Administrative Hearing held on March 6, 2001, Plaintiff testified his symptoms of PTSD began immediately after the assault in March 1995 (R. 178). He did not seek help for those mental symptoms until 1999, nearly four years later, because he felt he could deal with them on his own. He later found he could not, however. He finally went to Dr. Tinnin after his wife gave him an ultimatum, that he would either go seek help, or their marriage would be over (R. 179). Plaintiff testified there would be "no way" he could have reliably shown up every day for a job after the assault.

On August 30, 2004, Dr. Tinnin again opined: "It is my opinion with a high degree of medical certainty that [Plaintiff] is totally disabled and has been so since March 11, 1995" (R. 300).

At the second hearing Plaintiff again testified his symptoms began right after he was hurt in March of 1995 (R. 306). When asked why he waited four years to get treatment, Plaintiff testified that he "Was afraid to" (R. 307). A "big reason" was that he was afraid people would think he was weak, and that he thought men were not supposed to go to psychiatrists. Plaintiff's wife testified that he "pretty much went into a state of staring and being very withdrawn; complained about why this would happen to him; and was very confused and very disoriented" (R. 311). She testified she saw "a major difference in [him] in March of '95" (R. 317). When asked why Plaintiff did not seek help earlier, his wife testified:

> Well, it's my understanding that he would be admitting to a weakness. That he felt that if he asked anybody for help then there was something wrong with him. And I don't believe - - when I encouraged him to go I mean his reaction was that he would

work it out himself. He thought he could work it out himself until it came to an impasse.

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits only through September 30, 1995.

2.      The claimant did not engage in any apparent substantial gainful activity from March 11 through September 30, 1995, the period initially at issue herein.

3.      During the period from March 11 through September 30, 1995, the claimant had no medically determinable impairment that imposed, whether considered individually or in combination, any significant limitations upon his mental or physical ability to perform basic work activities that persisted or were likely to persist for a period of at least 12 consecutive months. Therefore, the claimant during that period had no "severe," medically determinable impairment(s) (20 CFR § 404.1520).

4.      The claimant was not under a "disability," as defined in the Social Security Act, at any time from March 11, through September 30, 1995, the period initially at issue herein and after which he no longer met the requirements as to insured status which condition any potential entitlement to a Period of Disability and Disability Insurance Benefits (20 CFR § 404.1520(c)).

(R. 210-211).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The

Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo

review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred in openly refusing to follow mandatory authority and, subsequently, in finding that no retrospective medical opinion can be anything but unreliable speculation;

2. The ALJ's finding that there was no evidence that a severe impairment existed prior to September 30, 1995 is not supported by the rulings and case law; and

3. The ALJ erred in failing to afford controlling weight to Dr. Tinnin's opinions under SSR 96-2p.

Defendant contends:

1. The evidence supports the ALJ's determination that Plaintiff did not have a severe mental impairment prior to the expiration of his insured status;

## C. Dr. Tinnin's Retrospective Opinion

There is really one issue remaining in this case, and it is the same issue for which this Court remanded the claim in 2004. That is, whether the ALJ properly considered Dr. Tinnin's opinion of March 1999, that Plaintiff suffered from disabling PTSD in March 1995.

As the undersigned stated in the previous Report and Recommendation:

> There is no dispute that Plaintiff sought no diagnosis or treatment for any alleged mental impairment before his insured status expired, and, in fact, for three years after his insured status expired. At that time he was diagnosed with questionable depression, and was prescribed Paxil. He found he could not tolerate the Paxil and was switched to Zoloft. Plaintiff also could not tolerate the Zoloft and refused further anti-depressants.

> Plaintiff began seeing Dr. Tinnin in February 1999, over three years after his insured status expired, and almost four years after the assault. On March 5, 1999, Dr. Tinnin wrote a letter to the West Virginia Court of Claims, opining that Plaintiff was suffering from PTSD and major depression as a direct result of the assault in March 1995. On July 19, 2000, State agency reviewing psychologist Frank D. Roman, Ed.D., completed a psychiatric Review Technique ("PRT"), opining there was insufficient medical evidence prior to Plaintiff's date last insured (R. 110). On July 20, 2000, State agency reviewing physician Fulvio Franyutti, M.D., likewise indicated there was insufficient medical evidence prior to Plaintiff's date last insured (R. 119).

> On October 30, 2000, Dr. Tinnin wrote a letter to Plaintiff's counsel, stating that Plaintiff was under his care for PTSD and major depression caused by the assault in March 1995 (R. 127). He opined that the PTSD was the direct result of the injuries Plaintiff sustained in the assault. He commented that Plaintiff had been "fearful and loath to consult a psychiatrist until his wife arranged the appointment and coerced him to come in." Dr. Tinnin opined that, despite the delayed treatment, Plaintiff's symptoms had immediately followed the trauma and were not delayed in onset. He finally stated that Plaintiff was "severely impaired and totally disabled and has been so since March 11, 1995."

> At the Administrative Hearing, Plaintiff testified his symptoms of PTSD began immediately after the assault in March 1995 (R. 178). He did not seek help for those mental symptoms until 1999, four years after his date last insured, because he felt he could deal with it on his own. He testified that he later found he could not, however. He finally went to Dr. Tinnin after his wife gave him an ultimatum that he either get

help, or their marriage would be over (R. 179). Plaintiff testified there would be "no way" he could have reliably shown up every day for a job after the assault.

The undersigned first notes, as he did in the previous case, that there is absolutely no evidence, prior to February 1999, that Plaintiff had PTSD or any symptoms of PTSD. He did not seek any treatment or diagnosis for the disabling symptoms he alleges began in March 1995, for nearly four years. In fact, he never mentioned them. Although he saw his regular treating physician for check ups and physical complaints during these four years, there is no mention in any record of nightmares, recollections of trauma, sleep difficulties, withdrawal or staring at walls. Plaintiff admits he never mentioned any of these mental symptoms to his treating physicians. The sole evidence that Plaintiff had any severe impairment prior to his date last insured is therefore Dr. Tinnin's opinion. Dr. Tinnin had never seen Plaintiff before February 1999, nearly four years after the assault.

The Fourth Circuit has held that "medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability." Wooldridge v. Bowen, 816 F.2d 157 (4th Cir. 1987). Further, in a later case, Wilkins v. Secretary, DHHS, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit held:

> An ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence.

It is undisputable that Dr. Tinnin is Plaintiff's treating psychiatrist. The prior ALJ's decision was reversed because he did not consider Dr. Tinnin's opinions, and failed to even mention them. The undersigned found this omission constituted reversible error.

In the present case, however, the undersigned finds ALJ Alexander did consider Dr. Tinnin's

13

retrospective opinion, discussing it at great length. ALJ Alexander first found it "highly significant" that Plaintiff sought no psychiatric evaluation, services or counseling for a period of nearly four years. He correctly noted that Plaintiff's visits to his regular treating physician gave "no indication that he was experiencing any disabling recollections of trauma and regular nightmares." He noted Plaintiff's report to Dr. Tinnin in 1999, that part of his mental distress was because he "was unable to find suitable work." He noted that even Dr. Tinnin found Plaintiff had had a GAF of 60 in the past year, at the very upper limit of the GAF denoting only moderate symptoms. A GAF of 61 would have denoted only some mild symptoms.[2]

The ALJ then noted that Dr. Tinnin's opinions appeared to be based solely upon Plaintiff's own subjective presentation and complaints, which the ALJ found not fully credible (R. 208). There is no evidence of testing. Additionally, Plaintiff's complaints included symptoms related to the recent deaths of two of his family members, financial difficulties, and inability to find "suitable" work. Even with these additional stressors, the ALJ found Dr. Tinnin's findings failed to indicate any totally disabling mental impairment, even in February 1999.

The ALJ noted that only six weeks after his first visit with Dr. Tinnin, Plaintiff was "asymptomatic" and free of intrusive, avoidant, and arousal symptoms, although he "remained concerned about not working and unhappy about the unavailability of the kind of job that he is

---

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Id.

14

experienced with." (Emphasis added).

In light of the above evidence, the ALJ rejected Dr. Tinnin's October 2000 opinion that Plaintiff had experienced "marked" impairment-related limitations since March 1995, and was, as a result, "severely impaired and totally disabled since March 11, 1995." The ALJ found Dr. Tinnin's opinion unsupported by his own treatment records.

The undersigned agrees with the ALJ that Dr. Tinnin's opinion that Plaintiff met two listings and was disabled in March 1995, is not supported by his own reports. When he finally saw Dr. Tinnin, nearly four years after the assault, the doctor found:

> He is casually dressed, of slender build and normal stature and appears his stated age with a presentation of restrained friendliness and constant anxiety. He is alert and oriented, and has adequate communication skills. His motor behavior is undisturbed including gait, activity level, general expressiveness, and facial expression. His language showed coherent connections between words and phrases. He described intrusive, avoidant, and arousal symptoms. There is no other abnormality of thought content. He denied suicidal and homicidal ideation or intent. He denied auditory and/or visual hallucinations and delusions. He reports some amnesia for events associated with the trauma. He denies substance abuse. His cognitive functions are intact. There is no evidence of disturbed sense of time, volition, body image, identity or capacity for symbolization. He has a good fund of knowledge and average intelligence. His insight into the psychological nature of his symptoms is adequate and his motivation for treatment is good.

(R. 139). Based on these findings, Dr. Tinnin diagnosed PTSD and Major Depression, moderate, and assessed Plaintiff's GAF at 50[3] currently and a high of 60[4] in the past year.

Six weeks after Plaintiff's first visit with Dr. Tinnin, the psychologist noted that Plaintiff was

---

[3]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Id.

[4]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Id.

free of intrusive, avoidant, and arousal symptoms, but remained concerned about not working and remained <u>unhappy about the unavailability of the kind of job that fit his experience, although he was "not as obsessed with this"</u> (R. 133). Dr. Tinnin believed there was no indication for further trauma procedures. He thought Plaintiff would benefit from attending the Men's Group, but Plaintiff deferred. Dr. Tinnin assessed Plaintiff's GAF at 87.[5]

In September 1999, Plaintiff had "No PTSD symptoms but considerable nostalgia for the old job. He is <u>enjoying good health and is living a productive life.</u>" In December 1999, Plaintiff was in good spirits, and expected to "<u>continue to be busy.</u>" He enjoyed the holidays and was "<u>very active.</u>" In March 2000, Plaintiff was in good spirits and reported no problems. The record therefore indicates an entire year during which Plaintiff was productive, busy, and free of symptoms from PTSD. This evidence does not support Dr. Tinnin's opinion that Plaintiff was totally disabled due to his mental impairments since 1995.

In May 2000, the release of one of the perpetrators "stirred up" Plaintiff's anxiety and grief, and he was "having some return of the intrusive symptoms in the form of distressing recollections of the event and nightmares." It is also noted, however, that Plaintiff had only begun taking his Paxil the week before. In June, Plaintiff reported feeling some benefit from the Paxil, sleeping more restfully, and feeling more at ease. In September, Plaintiff appears to have had a setback, with depression, despairing mood, irritable affect, anhedonia, anorexia, and weight loss, but two weeks later he felt "much improved" and was "beaming" (R. 144). Yet in October 2000, Dr. Tinnin opined

---

[5]A GAF of 81-90 indicates **Absent or minimal symptoms** (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). <u>Id.</u>

Plaintiff had been totally disabled from all work due to mental impairments since March 1995.

The undersigned finds these office notes do not support, and are inconsistent with Dr. Tinnin's opinion that Plaintiff met two mental Listings and was totally disabled since March 1995.

Additionally, in his Application for Disability, Plaintiff stated he had stopped working on March 11, 1995, due to severe injuries that prevented him from being able to work (R. 54). Yet Plaintiff's wife testified he was not working at the time he was assaulted (R. 311). He had been laid off from a job in the pharmaceutical industry making $40,000 a year in 1989. After that, Plaintiff ran his own business, which apparently made no money for the next five years. Plaintiff left that business and it was sold about six months before the assault. Plaintiff's wife testified that Plaintiff had hoped to get a job back in pharmaceutical work. The undersigned finds that substantial evidence supports the ALJ's conclusion that Plaintiff's statements to his psychiatrist about being depressed over not being able to find "suitable work" and being "unhappy about the unavailability of the kind of job that fit his experience" are inconsistent with total disability due to PTSD.

Dr. Tinnin's opinion that Plaintiff was totally disabled by his severe mental impairments since March 1995 is also inconsistent with the other persuasive evidence of record. First, as already noted numerous times, there is no mention of any mental impairment or concern in the record for nearly three years after Plaintiff's insured status expired. Plaintiff sought absolutely no help for his alleged totally disabling mental impairments. A claimant's failure to use medications or treatment support the Commissioner's finding that the underlying condition was not severe. 20 C.F.R. § 416.929(c)(3)(iv); Mickles v. Shalala, 29 F.3d 918, 929 n.8 (4th Cir. 1994) (concurring opinion). An "inconsistency between the claimant's characterization of the severity of [his] condition and the treatment [he] sought to alleviate that condition is highly probative of the claimant's credibility." Id.

Nor is this a case where Plaintiff alleges financial difficulty caused him to avoid treatment. Indeed the record shows he saw physicians during the relevant time for various physical ailments, but he never mentioned to them any mental problems.

Additionally, State agency reviewing psychologist Frank D. Roman, Ed. D. opined that Plaintiff would have only a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, would seldom experience deficiencies of concentration, persistence or pace and never experienced episodes of deterioration or decompensation (R. 117). In July 2000, another State agency reviewing psychologist, Joseph Kuzniar, Ed.D. agreed with Dr. Roman's findings. It is significant to the undersigned that the record indicates the state psychologists reviewed the records of Plaintiff's office visits with Dr. Tinnin from February 1999 through at least May 2000, in forming their opinions.

The undersigned finds the above evidence is persuasive and contradicts Dr. Tinnin's opinion that Plaintiff met two mental Listings both at the time of the opinion and back to March 1995. The Fourth Circuit has found just such evidence supported an ALJ's conclusion regarding a retrospective opinion. In Montgomery v. Chater, 107, F.3d 866 (4th Cir. 1997)(unpublished),[6] the Court discussed a treating physician's retrospective opinion. The ALJ in Montgomery found that the claimant's treating physician's contemporaneous records documenting the claimant's condition at the time of treatment failed to corroborate his retrospective opinions. The Court then stated:

> Although Montgomery's treating physician opined in 1992 that Montgomery was disabled "probably since 1983, but certainly since 1986," his contemporaneous treatment records do not support that conclusion. Instead his notes reveal that Montgomery experienced sporadic feet and leg problems between 1985 and 1987 and that she received treatment for those problems on only two occasions in 1985 and

[6]Pursuant to CTA4 Rule 36(c), the a copy of Montgomery is attached to this Opinion.

once in 1986. At those times, mild to moderate pain medication alleviated her discomfort. These three treatments alone do not clearly show that she was disabled prior to the date she was last insured. Furthermore, her treating physician did not refer Montgomery to a specialist until 1989, well after her insured status expired. In sum, the treating physician's contemporaneous treatment records lack any clinical findings of a disability which prevented Montgomery from performing nonexertional, sedentary work. Additionally, the ALJ properly discounted Montgomery's other alleged physical limitations of anxiety, depression, shortness of breath, and nerves, because none of her medical records indicate she was treated for any of these maladies before she no longer qualified for special disability benefits.

In light of this persuasive contradictory evidence, the ALJ properly discredited the treating physician's opinion pursuant to the requisite social securities regulations and case law. We conclude therefore that the Commissioner's decision is supported by substantial evidence and was based on the correct legal standards. Accordingly we will not disturb the ALJ's findings.

(Emphasis added).

The Court reviews the ALJ's final decision only to determine whether it is supported by substantial evidence and whether the correct law was applied. 42 U.S.C.A. § 405(g). The Court must uphold the ALJ's finding of no disability, even if the Court disagrees, as long as it is supported by substantial evidence. Id.; Smith v. Schweiker, 795 F.2d 343 (4th Cir. 1986). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

As the Fourth Circuit found in Montgomery, the undersigned here finds substantial evidence supports the ALJ's findings regarding Dr. Tinnin's retrospective opinion and his conclusion that Plaintiff was not under a disability as defined in the Social Security Act, at any time through September 30, 1995.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed from the court's docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _8_ day of June, 2006

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

Westlaw.

107 F.3d 866

107 F.3d 866, 1997 WL 76937 (C.A.4 (S.C.))
**(Cite as: 107 F.3d 866)**

**C**

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Betty MONTGOMERY, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social Security, Defendant-Appellee.
**No. 95-2851.**

Argued Jan. 27, 1997.
Decided Feb. 25, 1997.

Appeal from the United States District Court for the District of South Carolina, at Columbia. David C. Norton, District Judge. (CA-93-357-3-18BC)

**ARGUED:** Paul Townsend McChesney, FRALEY, MCCHESNEY & MCCHESNEY, Spartanburg, SC, for Appellant. Ronald Lamar Paxton, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION, Atlanta, GA, for Appellee. **ON BRIEF:** Frank W. Hunger, Assistant Attorney General, Margaret B. Seymour, Interim United States Attorney, Mary Ann Sloan, Acting Chief Counsel, Region IV, Mack A. Davis, Acting Deputy Chief Counsel, Haila Naomi Kleinman, Supervisory Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION, Atlanta, GA, for Appellee.

Before RUSSELL and WILKINS, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.

OPINION

PER CURIAM:

*1 Betty Montgomery filed a claim with the Social Security Administration in June 1991 for a period of disability and disability insurance benefits. [FN1] She alleged disability commencing on December 31, 1985, as a result of blood clots in her left leg, edema, shortness of breath, and nerves. After denial of her claim initially and on reconsideration, Montgomery requested a hearing before an Administrative Law Judge ("ALJ"). After considering her claim *de novo*, the ALJ concluded that Montgomery was not entitled to disability insurance because she was not disabled at any time through September 30, 1986-the date she last qualified to receive disability insurance. The ALJ further concluded that Montgomery had a residual capacity for a full range of sedentary unskilled work in the national economy. The ALJ's findings became the final decision of the Commissioner of Social Security (the "Commissioner") after being approved by the Appeals Council in April 1993.

FN1. 42 U.S.C. §§ 416(i)(1), 423.

Montgomery then filed a complaint in the district court challenging the Commissioner's final decision was unsupported by substantial evidence. The magistrate judge's Report and Recommendation recommended affirming the Commissioner's decision denying benefits. After conducting a *de novo* review of those portions of the magistrate judge's report to which Montgomery objected, the district court adopted the magistrate judge's report and affirmed the Commissioner's decision. This appeal followed.

The ALJ reviewing the case bears the responsibility of making findings of fact and resolving evidentiary conflicts.[FN2] We review the Commissioner's final decision only to determine whether it is supported by substantial evidence and whether the correct law was applied.[FN3]Section 405(g) precludes our reviewing the evidence *de novo* and requires that we uphold the commissioner's finding of no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disability, even if we disagree, as long as it is supported by substantial evidence.[FN4] Montgomery contends that substantial evidence does not support the ALJ's findings because the ALJ failed to accord great weight to her treating physician's opinion that she was disabled prior to or on September 30, 1986, and to consider the vocational evidence she presented. She maintains that when evaluated together, this evidence proves that she suffered from impairments that prohibited her from engaging in her old occupations [FN5] and in any other substantial gainful activity.

> FN2. *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir.1996).

> FN3. 42 U.S.C.A. § 405(g) (West Supp.1996).

> FN4. *Id; Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986).

> FN5. Prior to September 30, 1986, Montgomery worked as a spool operator and cafe worker.

Before considering vocational evidence, the ALJ must examine and weigh the opinions and reports of the claimant's treating physician. The ALJ must give a treating physician's opinion great weight unless persuasive contradictory evidence exists.[FN6] When contradictory evidence exists, then the ALJ may disregard the opinion. Similarly, the ALJ may only reject a treating physician's retrospective opinion concerning the extent of past impairment in the presence of persuasive contradictory evidence. [FN7]

> FN6. *Chater,* 76 F.3d at 589.

> FN7. *Wilkins v. Secretary, DHHS,* 953 F.2d 93 (4th Cir.1991).

After thoroughly evaluating the evidence before him, the ALJ found that the treating physician's contemporaneous records documenting Montgomery's condition at the time of treatment failed to corroborate his retrospective opinions. Although Montgomery's treating physician opined in 1992 that Montgomery was disabled "probably since 1983, but certainly since 1986," his contemporaneous treatment records do not support that conclusion. Instead his notes reveal that Montgomery experienced sporadic feet and leg problems between 1985 and 1987 and that she received treatment for those problems on only two occasions in 1985 and once in 1986.[FN8] At those times, mild to moderate pain medication alleviated her discomfort. These three treatments alone do not clearly show that she was disabled prior to the date she was last insured. Furthermore, her treating physician did not refer Montgomery to a specialist until 1989, well after her insured status expired. In sum, the treating physician's contemporaneous treatment records lack any clinical findings of a disability which prevented Montgomery from performing nonexertional, sedentary work. Additionally, the ALJ properly discounted Montgomery's other alleged physical limitations of anxiety, depression, shortness of breath, and nerves, because none of her medical records indicate she was treated for any of these maladies before she no longer qualified for special disability benefits.

> FN8. Montgomery was treated for fibrositis or bursitis of the lower extremity on two consecutive visits, September 23, and October 1, 1985, more than a year before her insured status expired. Then she visited the emergency room in July 1986 for swelling in both legs and feet. Following that visit, it was not until August 1987, almost one year after the expiration of her insured status that she was hospitalized for severe leg problems.

**\*2** In light of this persuasive contradictory evidence, the ALJ properly discredited the treating physician's opinion pursuant to the requisite social securities regulations and case law. We conclude therefore that the Commissioner's decision is supported by substantial evidence and was based on the correct legal standards. Accordingly we will not disturb the ALJ's findings.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 F.3d 866

107 F.3d 866, 1997 WL 76937 (C.A.4 (S.C.))
**(Cite as: 107 F.3d 866)**

Having carefully reviewed the record, briefs, and contentions of the parties at oral argument, we find no error in the district court's order adopting the magistrate judge's Report and Recommendation. We therefore affirm the decision of the district court on the opinion of that court.

*AFFIRMED*

C.A.4 (S.C.),1997.
Montgomery v. Chater
107 F.3d 866, 1997 WL 76937 (C.A.4 (S.C.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.